IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
UNITED STATES OF AMERICA; THE    )
STATE OF NORTH CAROLINA; AND     )
THE COMMONWEALTH OF VIRGINIA,    )
SECRETARY OF NATURAL             )
RESOURCES,                       )
                                 )
           Plaintiffs,           )      1:19-cv-00707
                                 )
     v.                          )
                                 )
DUKE ENERGY CAROLINAS, LLC,      )
                                 )
           Defendant.            )
```

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Before the court is the unopposed motion of Plaintiffs United States of America, the State of North Carolina, and the Commonwealth of Virginia, Secretary of Natural Resources for entry of a consent decree lodged on July 18, 2019. (Doc. 4.) The motion was heard in open court on November 4, 2020, via a video-conference hearing (owing to the ongoing COVID-19 pandemic) at which all parties appeared through counsel. For the reasons set forth below, the motion will be granted and the parties' proposed consent decree (Doc. 2-1) will be entered.

I. BACKGROUND

Defendant Duke Energy Carolinas, LLC ("Duke Energy") owns the area along the Dan River near Eden, Rockingham county, North Carolina, which encompasses a former coal-fired power plant and

its coal ash basins (collectively "the Dan River Steam Station"). (Doc. 5 at 3.)

On February 2, 2014, a storm water pipe underneath the primary coal ash basin at the Dan River Steam Station failed and spilled approximately 27 million gallons of coal ash wastewater and between 30,000 and 39,000 tons of coal ash into the Dan River ("the spill"). (Id.) In the days immediately following the spill, coal ash and/or ash-like material was found as far as seventy miles downstream of the Dan River Steam Station. (Id. at 3, 4.) As a result of the spill, hazardous substances were released into the environment. (Id. at 4.)

### A. Prior Proceedings

The spill has been the subject of multiple prior proceedings, as explained by counsel at the hearing on this matter. Most notably, in 2015, following a federal investigation into the spill, Duke Energy pleaded guilty to nine misdemeanor offenses arising out of the spill and was placed on a five-year probationary period. See also Duke Energy, United States Reach Proposed Agreement on Dan River, Duke Energy (Feb. 20, 2015), https://news.duke-energy.com/releases/duke-energy-united-states-reach-proposed-agreement-on-dan-river. Further, counsel indicated that Duke Energy has paid over $300 million in coal ash-related costs since the spill, including the following: a $102 million criminal penalty, with $68.2 million in fines and restitution for the spill

2

and $34 million for community service and mitigation, see id.; $100 million to the State of North Carolina and the Commonwealth of Virginia; $21 million in clean-up costs relating to the spill; and $1.3 million to the city of Danville, Virginia. See also Bruce Henderson, Digging Up Duke Energy's Coal Ash Will Cost Billions, Charlotte Observer (Jan. 22, 2020), https://www.charlotteobserver.com/news/local/article239175103.html.

    **B.   Present Proceedings**

Plaintiffs here are the federal and state trustees of the natural resources impacted by the spill in North Carolina and Virginia. (Doc. 5 at 1.) Pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), trustees may act on behalf of the public to pursue natural resource damages for injury to, destruction of, or loss of natural resources. See 42 U.S.C. § 9607(f). In this role, the Trustee agencies — the United States Department of the Interior, the North Carolina Department of Environmental Quality, and the Virginia Department of Environmental Quality — conducted a natural resource damage assessment and restoration process ("NRDAR") regarding the spill. (Id. at 1, 2.) The NRDAR process was focused on identifying and remediating damages to specific ecological resources and to human use of the Dan River. (Id.) Based on the

3

NRDAR process and negotiations with Duke Energy, the subject consent decree resulted. (Id.)

To compensate for the spill's harms to specified ecological resources and to human use of the Dan River, the consent decree provides for five restoration projects: the Pigg River Power Dam partial removal; Abreu-Grogan Park improvements; two Mayo River land conservation projects; and a public boat access project.[1] (Doc. 2-1 at 12-14.) The first Mayo River land conservation project resulted in the transfer of 340 acres of land along the Mayo River to North Carolina and 214 acres to Virginia. (Doc. 5-2 at 35.) The second Mayo River land conservation project transferred an additional 64 acres of river land to North Carolina. (Id.) In addition to completing the selected restoration projects, the consent decree also provides that Duke Energy will pay a total of $57,310 for the costs of natural resource restoration planning, implementation, and monitoring incurred by the Trustees in connection with the spill.[2] (Doc. 2-1 at 11-12.)

---

[1] At present, Duke Energy has completed all but the public boat access project. (See Doc. 5 at 10-11; Doc. 5-2 at 21-23.)

[2] Prior to the lodging of the consent decree, Duke Energy previously paid at least $1.3 million to Plaintiffs as reimbursement for costs incurred in connection with the spill. (Doc. 2-1 at 6.) Although the Trustees considered requesting additional funds for the ongoing operation and maintenance of the restoration projects, they concluded that additional monetary compensation was not necessary to relieve the harm. (Doc. 5 at 19.) The restoration project properties were conveyed with the understanding that the state agencies would be responsible for the long-term management of the properties. (Id.)

On July 18, 2019, Plaintiffs filed a complaint with the court seeking relief for injuries sustained to specified ecological resources and to human use of the Dan River due to the spill. (Doc. 1 ¶¶ 22–23.) Along with the complaint, Plaintiffs filed the proposed consent decree (Doc. 2-1) and thereafter held a 45-day public comment period on the consent decree and Draft Restoration Plan (Doc. 5 at 2; Doc. 5-2 at 8). During the public comment period, the Southern Environmental Law Center ("SELC") filed a comment regarding the proposed consent decree on behalf of itself, the Dan River Basin Association, the Dan Riverkeeper, the Good Stewards of Rockingham, the Roanoke River Basin Association, and the Stokes County Branch of the North Carolina NAACP. (Doc. 5 at 2; Doc. 5-1.) The comment identified perceived deficiencies in the NRDAR process and claimed that the Trustees did not provide sufficient information in order for the public to determine whether the proposed projects are adequate to compensate for the environmental harms of the spill. (Doc. 5-1 at 2.) In response to SELC's comment, the Trustees revised the Restoration Plan by adding information in Section Two, further explaining the NRDAR process undertaken and the Trustees' calculation of damages to the environment.[3] (Doc. 5 at 18.)

---

[3] In response to a Freedom of Information Act request submitted by SELC, the Trustees have also provided SELC with 379 documents relevant to the natural resource injuries and the benefits of the selected restoration projects. (Doc. 5 at 18.) These documents provide greater insight into

5

On September 21, 2020, Plaintiffs filed their unopposed motion to enter the consent decree with the court. (Doc. 4.) On November 4, 2020, a public hearing was held in open court at which counsel appeared by videoconference to address the consent decree. During that hearing, no objector appeared or even attended in the public gallery. The parties reported that they were unaware of any objections to the proposed consent decree.

## II. ANALYSIS

### A. Consent Decree Standard

A consent decree is a negotiated agreement that "'has elements of both judgment and contract,' and is subject to 'judicial approval and oversight' generally not present in other private settlements." Szaller v. Am. Nat. Red Cross, 293 F.3d 148, 152 (4th Cir. 2002) (quoting Smyth v. Rivero, 282 F.3d 268, 279–80 (4th Cir. 2002)). "Because it is entered as an order of the court, the terms of a consent decree must also be examined by the court." Smyth, 282 F.3d at 280. In reviewing the terms of a consent decree, the court may not modify the agreement, but can only accept or reject the terms to which the parties have agreed. See United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1435 (6th Cir. 1991); Officers for Just. v. Civ. Serv. Comm'n, 688 F.2d 615, 630 (9th Cir. 1982).

---

the environmental modeling applied by the Trustees in determining that the selected restoration projects are sufficiently compensatory.

6

The Fourth Circuit has explained that when considering whether to enter a proposed consent decree, courts "should be guided by the general principle that settlements are encouraged." United States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999). "Courts considering CERCLA cases have recognized that the usual federal policy favoring settlements is even stronger in the CERCLA context." B.F. Goodrich v. Betkoski, 99 F.3d 505, 527 (2d Cir. 1996). Further, "[t]he presumption in favor of settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency specially equipped, trained, or oriented in the field." United States v. Cannons Eng'g Corp., 720 F. Supp. 1027, 1035 (D. Mass. 1989), aff'd, 899 F.2d 79 (1st Cir. 1990) (internal citation omitted); see also Akzo Coatings, 949 F.2d at 1436. Broad deference should be afforded to the agency's expertise. United States v. District of Columbia, 933 F. Supp. 42, 47 (D.D.C. 1996).

Nevertheless, district courts should not blindly accept the terms of a proposed settlement. See Flinn v. FMC Corp., 528 F.2d 1169, 1173 (4th Cir. 1975). "[B]efore entering a consent decree the court must satisfy itself that the agreement is 'fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.'" North Carolina, 180 F.3d at 581 (quoting United States v. Colorado, 937 F.2d 505, 509

7

(10th Cir. 1991)). Fairness has both procedural and substantive components. Cannons Eng'g Corp., 899 F.2d at 86–88. Procedural fairness is measured by gauging the "candor, openness, and bargaining balance" of the negotiation process, whereas substantive fairness requires that a party "bear the cost of the harm for which it is legally responsible." Id. Substantive fairness is closely linked to reasonability and adequacy. See id. at 90 ("The three broad approval categories were not meant to be mutually exclusive and cannot be reviewed in majestic isolation."); see also United States v. CSX Transp., Inc., No. 2:18-CV-01175, 2019 WL 97820, at *2 (S.D.W. Va. Jan. 3, 2019); United States v. City of Welch, W. Va., No. 1:11-00647, 2012 WL 385489, at *3 (S.D. W. Va. Feb. 6, 2012); United States v. Pioneer Nat. Res. Co., 452 F. Supp. 3d 1005, 1013–14 (D. Colo. 2020). Ultimately, the "court's core concern in deciding whether to approve [a] proposed decree is with ensuring that the decree furthers the public interest as expressed in CERCLA." United States v. Rohm & Haas Co., 721 F. Supp. 666, 680 (D.N.J. 1989).

CERCLA is "a broad remedial statute that was designed to enhance the authority of the EPA to respond effectively and promptly to toxic pollutant spills that threaten[] the environment and human health." B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1197 (2d Cir. 1992). As a remedial statute, CERCLA should be construed broadly in order to give effect to its purposes. See

8

United States v. Carolina Transformer Co., 978 F.2d 832, 838 (4th Cir. 1992). These purposes include "facilitating efficient responses to environmental harm, holding responsible parties liable for the costs of the cleanup, and encouraging settlements that reduce the inefficient expenditure of public funds on lengthy litigation." United States v. E.I. du Pont de Nemours & Co., No. 5:16-CV-00082, 2017 WL 3220449, at *11 (W.D. Va. July 28, 2017) (internal citations omitted). Two major policy concerns underlie CERCLA: "First, Congress intended that the federal government . . . [have] the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems . . . bear the costs and responsibility for remedying the harmful conditions they created." Cannons Eng'g Corp., 899 F.2d at 90-91 (internal citation omitted).

**B. Assessment of Agreement**

Plaintiffs contend that the proposed consent decree is fair, adequate, and reasonable because it was negotiated in good faith, addresses the allegations in the complaint, and is consistent with the goals of CERCLA. The court agrees.

Under the proposed consent decree, Duke Energy is required to implement the restoration projects selected in the Trustee's Restoration Plan which are aimed at restoring losses to specified natural resources and related use resultant from the spill. Duke

9

Energy must also compensate Plaintiffs for restoration planning, implementation, and monitoring costs incurred by the Trustees due to the spill. Under the agreement, Plaintiffs reserve the right to institute additional proceedings against Duke Energy for any further damage to natural resources resultant from the spill that was unknown, including damage unknown in severity, at the time the consent decree was lodged. (Doc. 2-1 ¶ 55.)

The decree is procedurally fair. The agreement was negotiated with significant public involvement. The Trustees provided ample opportunity for public comment over multiple years, and the public was directly involved in the creation of the Final Restoration Plan. Between 2014 and 2019, the Trustees held four public meetings to address developments relating to remediation of the spill. These meetings provided opportunities for the public to comment on proposed restoration projects, the draft assessment plan, and the final restoration plans. The restoration projects ultimately selected originated from the 2015 public scoping meeting in which the Trustees solicited public comments regarding potential restoration plans. In addition to public involvement, the parties engaged in an arms-length negotiation by experienced counsel over several years. Negotiations for the present settlement began in the fall of 2017 and continued through the submission of the draft consent decree in the summer of 2019. During negotiations, each side independently evaluated the impacts

10

of the spill, presented its perspectives to the other side, and exchanged multiple drafts of the consent decree. See United States v. ConocoPhillips Co., No. 2:10 CV1556, 2011 WL 1113703, at *3 (W.D. La. Mar. 24, 2011); CSX Transp., 2019 WL 97820, at *2 (considering a consent decree to be procedurally fair where it was the product of an arms-length negotiation, the parties were represented by experienced counsel, and parties exchanged technical and forensic information about the spill and its aftermath). No comments were submitted that suggested the parties did not act in good faith in negotiating the terms of the consent decree. As such, the consent decree is procedurally fair.

Likewise, the consent decree is substantively fair, reasonable, and adequate. In many CERCLA cases, "the extent of harm cannot be completely and accurately identified." ConocoPhillips, 2011 WL 1113703, at *3. This is particularly true in the present case where Plaintiffs seek to recover non-monetary injuries, specifically seeking to remediate ecological harm to aquatic life and harm sustained by humans due to loss of use. (Doc. 1 ¶ 22.) Based on the best available evidence, the consent decree is fair. As outlined in declaration of Sara E. Ward, case manager with the United States Fish and Wildlife Service responsible for the NRDAR process, the Trustees applied both an ecological services model and a human use services model to determine the extent of harm to natural resources and their

11

services. (Doc. 5-2 at 2-9.) Based on these models, the Trustees provided estimates of the harms both to aquatic life and to human use. (Id.) Although the Trustees did not reach a complete consensus on the injury quantification estimates, the Trustees did agree that the proposed consent decree would compensate for the losses. (Id. at 8.)

The decree represents a fair and reasonable remedy in that it requires Duke Energy to perform the restoration projects as selected by the Trustees to address the injury caused by the spill. These projects address the injury caused by the spill both in terms of the ecological harm — addressed by the Pigg River Power Dam partial removal project and Mayo River land conservation projects — and harm to human recreational use — addressed by the Abreu-Grogan Park improvements, public access to the Mayo River parcels, and the public boat access project. Based on the nature of the harms alleged, which are difficult to quantify in terms directly comparable to the benefits anticipated from the selected restoration projects, the court is satisfied that the Trustees have demonstrated the consent decree is a fair and reasonable remedy.[4] The court also notes that Plaintiffs reserve the right

---

[4] The Trustees quantified the damages to ecological life in terms of the spatial extent of the coal ash deposited, including the spatial extent of impacts of ash removal, and the temporal nature of the aquatic life's exposure to hazardous substances and related duration of the injury. (Doc. 5-2 at 28-29.) The Trustees quantified the benefits of the Pigg River Power Dam partial removal and Mayo River land conservation projects in terms of miles of river restored, acres of land conserved, and

12

to pursue additional claims against Duke Energy should they learn the damage from the spill is more extensive than previously understood. As such, the court finds the consent decree to be substantively fair, reasonable, and adequate.

Finally, the court finds that the consent decree is consistent with and furthers both of the goals of CERCLA. First, the consent decree ensures a prompt and effective response to the losses incurred by the spill. At present, a majority of the projects included in the consent decree have already been completed. In approving the proposed consent decree, the court ensures that the final projects will be completed without subjecting the parties, the public, and the court to protracted litigation. Second, Duke Energy is bearing all of the costs of these restoration projects, including paying the Trustees' costs incurred in connection with the spill. As the restoration projects represent a fair and reasonable remedy for the harms sustained, Duke Energy's bearing of the costs for these projects under the terms of the consent decree is consistent with CERCLA.

---

specified, but unquantified, benefits to aquatic life and habitats resultant from this conservation. (Id.) The Trustees quantified damages to human use in terms of fishing trips lost (i.e. not taken) and the duration of losses in human-use services as a result of contact advisories and park closures due to the spill. (Id. at 29.) The Trustees used a benefit-transfer model to compare these losses in human use to the proposed benefits of the restoration projects. (Id. at 29-30.)

13

**III. CONCLUSION**

For the reasons stated, the court finds the proposed consent decree is fair, adequate, reasonable, and consistent with CERCLA.

IT IS THEREFORE ORDERED that Plaintiffs' unopposed motion to enter the consent decree (Doc. 4) is GRANTED and Plaintiffs' proposed consent decree (Doc. 2-1) will be ENTERED.

/s/   Thomas D. Schroeder
United States District Judge

November 6, 2020